DUFF v. GILLILAND et al.

(Circuit Court, W. D. Pennsylvania. February 20, 1905.)

1. CANCELLATION OF CONTRACT—GROUNDS—CONSTRUCTION.

A contract assigned the legal title to a patent for a gas producer to a trustee for the benefit of a corporation, in consideration of the payment by the assignee of a stipulated share of all royalties received from licenses. The company subsequently found it desirable, for the purpose of introducing the invention, to build the producers itself, and engaged in such business at a profit, granting licenses to those for whom it built. The contract contained no provision respecting such building operations which were not at that time contemplated, but the patentee was fully advised of the company's action, and from time to time expressed his approval thereof. He also acquiesced in the substitution of a new trustee who paid a large sum for an interest in the company and in the patent. *Held*, that in the absence of any provision in the contract, and under the facts shown, the building operations of the company did not constitute a violation of the contract which entitled the patentee to a cancellation thereof, nor was he entitled thereunder to a share of the profits from such business.

2. SAME.

A provision of the contract requiring the company to keep accounts showing the licenses granted which should be subject to the inspection of the patentee did not give him the right to inspection of the books covering the construction work, and a refusal to permit such inspection therefore constituted no ground for cancellation of the contract.

In Equity.

Kay, Totten & Winter, for complainant.
Bakewell & Byrnes, for respondents.

BUFFINGTON, District Judge. This is a bill in equity brought by Edward James Duff against Alexander Gilliland, as trustee, and against him and his partners, doing business as the Duff Patents Company. The bill concerns a certain patent (No. 517,271) granted to complainant for an improvement in gas producers, the legal title to which is now vested in said Gilliland, trustee, by virtue of a written instrument which stipulates for the payment of royalties to complainant. The bill prays for relief as follows:

"(1) That the defendants may be decreed to account for and pay unto your orator one-third of all the profits and benefits, or the entire revenue, made by these defendants in the granting of licenses, and the manufacture and sale of gas producers made in accordance with said letters patent. (2) That the said Alexander Gilliland, trustee, one of said defendants, be ordered to reassign unto your orator the entire right, title, and interest in and to said letters patent; that the said agreement may be canceled and declared null and void, and it be decreed that all rights granted thereunder unto these defendants have reverted unto your orator in accordance with the terms thereof, and that your orator be put in full possession of the powers and rights under said letters patent, the same as if said agreement had not been entered into.".

The facts in the case are that the complainant, a resident of Great Britain, invented a gas producer, and on March 27, 1894, received a United States patent, as above, for the same. Pending the grant of his patent, he entered into negotiations with his brother Alfred B. Duff and certain relatives named Bradley, with a view to introducing his invention in the United States, which resulted in the agreement following, which all parties signed:

"Whereas Letters Patent of the United States No. 517,271, were granted on the 27th day of March, 1894, to Edward James Duff, now of 478 Stockport Road, Longsight, Manchester, in the County of Lancaster, England, party of the first part, for an improvement in gas producers. And whereas, Alfred Barker Duff, of Allegheny, in the County of Allegheny, and State of Pennsylvania, party of the second part, is desirous of acquiring the entire right, title and interest in and to said Letters Patent, to have and to hold the same in trust as hereinafter mentioned. Now therefore, these presents witness, that the said party of the first part, for and in consideration of the sum of one dollar to him in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, has sold, assigned, transferred, and set over, and does hereby sell, assign, transfer, and set over to the said party of the second part the entire right, title and interest, in and to said letters patent No. 517,271, the same to be held by the said Alfred Barker Duff, his legal representatives and assigns, party of the second part, as aforesaid, in trust and for the use of James Anderson Bradley, William Henry Bradley, Alfred Barker Duff and William Chapman Bradley, their legal representatives and assigns, all of Allegheny aforesaid, partners doing business under the firm name of the Duff Patents Company, to the full end of the term for which said letters patent are granted; upon condition, nevertheless, and it is hereby covenanted and agreed by the said party of the second part, for and in consideration of the foregoing assignment, to and with the said party of the first part, his legal representatives and assigns. First. That the said party of the second part, his legal representatives and assigns, shall not sell or transfer the right, title and interest in and to said letters patent, or any part thereof, without the written consent of the said first party, his legal representatives and assigns, first obtained, excepting that the said party of the second part shall have full power to grant licenses under said letters patent for single states or territories of the United States of America, upon terms and conditions to be determined in and by his sole discretion. Second. That the said party of the second part, his legal representatives and assigns, shall pay or cause to be paid to the said party of the first part, his legal representatives and assigns, one-third of the gross payments and each of them received by the said party of the second part, his legal representatives and assigns, for and under each of said licenses which may be granted by the said party of the second part under said letters patent. Third. That the said party of the second part, his legal representatives and assigns, shall keep proper books of accounts in which shall be clearly recorded all their transactions under this agreement and in regard to the grant of licenses under said letters patent, which accounts shall be audited every six months, and a copy of certified balance sheets, together with full statement of all licenses and sales effected, shall immediately afterwards be sent to the said party of the first part, his legal representatives or assigns; at the same time there shall also be paid to the said party of the first part, his legal representatives and assigns, the amount due him under article two of this agreement. Fourth. That the said party of the first part shall have the right, either personally or by his attorney, to make an examination of all books, accounts and documents relating to the business transactions of the said party of the second part, his legal representatives and assigns, relating to the sale of rights and licenses under said letters patent, and the said party of the second part hereby agrees to give all the assistance in his power to make such examination exhaustive. Fifth. That in case the amount paid by the said party of the second part, his legal representatives and assigns to the said party of the first part, under this arrangement, shall not, at the end of two years from the date hereof,

amount to the sum of at least three hundred and fifty pounds sterling, or should the party of the second part, his legal representatives and assigns, fail to comply with the conditions and agreements herein contained, or any of them, then the said party of the first part, his legal representatives and assigns, shall have the right to recover all the rights, title and interest in said letters patent, and the same shall revert to him, his legal representatives and assigns, upon notice in writing to that effect being served upon the said party of the second part, his legal representatives and assigns, excepting that nothing herein contained shall be so construed as to impair any grants or licenses which at that time shall have been granted by the said party of the second part under said letters patent and under this agreement, nor shall the right of the said party of the second part, his legal representatives and assigns, to collect and receive royalty under such vested licenses and grants, as hereinbefore provided, be impaired or called in question by the said reversion. In testimony whereof the said parties have hereunto set their hands and seals this 6th day of August, A. D. 1894."

In our view of the facts, we find nothing to take the case out of the rule that all prior negotiations merged in this written contract. Krueger v. Nicola, 205 Pa. 38, 54 Atl. 494; Russell v. Glassworks, 6 Pa. Super. Ct. 118. That instrument is therefore the definition of the rights of the parties. The proofs show that when it was made the Duff Patents Company was not engaged in building gas producers, and that its early efforts were all directed to granting licenses. But it was soon found the company itself would have to build. Thus Alfred B. Duff, the trustee, whose conduct throughout the whole affair the complainant commends, in a letter dated May 17, 1895, describes how, in the efforts to introduce the producer at Syracuse, N. Y., the company was forced against its will to do so. He says:

"They [the proposed licensees] wanted us to do our own building, though I would much prefer not to; yet it seems our only salvation, unless we let Smythe get onto the deal which would never do and they have an idea we should do the work the best, seeing it is our producer."

It also appears that an arrangement to grant licenses made with Swindells, an extensive building firm, was not satisfactory, and resulted in their substituting a producer of their own instead of the Duff. Thus in the same letter Mr. Duff says:

"They have written Swindell about our producer and he ran it down and recommended his own, stating they would call and see them at an early date. This is a nice way to represent us and the sooner he is stopped the better. He just advertises our producer to find out who wants producers and then pushes his own."

The outcome was, the Duff Patents Company began taking contracts in many cases for the erection of producers. They sublet the bricklaying, obtained castings and other details from foundrymen, and furnished the plans, engineering oversight, and men to put the plant in operation when finished, themselves. It also appears that, in addition, they granted licenses where they could. It is proper to say that a difference of opinion existed as to the wisdom of the policy of themselves building. E. J. Duff claimed the proper plan for the company was to grant licenses and abstain from building, which latter, he claimed, alienated builders. He also claimed building was not within the purview of the agreement. The testimony of seemingly disinterested witnesses is that the producer could not have

been introduced unless the company itself built it. That complainant was fully cognizant that the Duff Company was doing construction work, and making large profits therefrom, is also shown. In November, 1897, a correspondence was had between him and the company, looking to a sale by the latter to an English company of its construction business and the patent. Under date of November 18th, the Duff Patents Company sent him a statement of its building operations, showing a profit during 1896 and 10 months of 1897 of almost $7,000. Not only so, but the complainant admits the idea had occurred to him as early as 1897 that he should claim a share in such construction profits; and, according to his brother's testimony, this contention was brought to the attention of his partners, and by them rejected. It will therefore appear, taking the complainant's own statement, that he knew of the Duff Company engaging in construction; that he knew they made profits thereby, and that the company denied his right to participate therein; and that he took no steps to enforce such alleged rights. And moreover, whatever complainant may have supposed his rights to be, it is clear he acquiesced in the course followed by the Duff Patents Company, and from time to time commended its efforts. This state of affairs continued until July, 1899, when, owing to ill health, A. B. Duff was compelled to retire from business. He thereupon sold out his interest in the patent and in the Duff Patents Company, for some $11,000, to Alexander Gilliland. By a paper dated July 5, 1899, and signed by the complainant and the Messrs. Wallace, the remaining parties, A. B. Duff conveyed his interest in the patent to Alexander Gilliland, who was substituted for A. B. Duff as trustee. Not only did Gilliland pay a large sum of money for the interest in the patent and in the construction business of the Duff Patents Company, but, as we have seen, E. J. Duff had knowledge of such construction business, and impliedly approved of the same. His letter of July 22, 1899, just following the assignment, states his position, and shows he made no objections to the construction operations theretofore carried on. Thus, speaking of his brother's retirement, he says:

"My regret is the greater that it has been forced upon him by ill health, and I know it is a great grief to him to give it up after all the hard pioneer work and at the time of its assured success. I can only hope that by the knowledge you have all obtained by experience and by the assistance of your new partner you will be able to go on with an increasing business. You are aware that owing to my brother being trustee and his partners relatives I made a very easy agreement in which I gave you great freedom and trusted to your honesty and friendship in dealing fairly with me. This spirit has I am glad to say been maintained up to now and I trust will be continued in the future, There are one or two points of importance on which I must as a matter of business speak firmly about. The first is that my royalties be maintained. The agreement was for sale of royalties and I have allowed you to deal and build. I believe in the past this has not affected me adversely and so long as it does not do so in the future I shall not raise any objection. The second point is, and I have noted it with regret, that you have a tendency to experiment with my patent. That is to construct producers different to my patented design. If you build a producer similar to a design lately presented to me by my brother, it would be an utter failure and damage the reputation of the 'Duff Producer.' I now as a matter of pure business precaution warn you officially and instruct you that you must not erect any new

design or variation from my design without my consent in writing. I am much surprised that you should wish to do such a thing."

Under date of February 5th of the following year, in acknowledging receipt of $6,700 for the half-year royalty, he wrote the company, "Allow me to congratulate you on a very satisfactory half-year's work, which it is pleasing to note you expect to maintain during the present half-year;" and on August 2d, acknowledging a check for the next half-year's royalty, of almost $10,000, he wrote, "I beg to congratulate you all on the good way you have improved the business and upon the good results you have obtained and in which I share."

From these statements, it will be seen that complainant knew the company was contracting; that he was impliedly encouraging it in its efforts; that, if he thought he was entitled under the agreement to participate in the profits of the Duff Patents Company's construction work, he was not insisting on it. Later on, serious differences arose between the parties, and friction followed. The complainant had declined to join to the full extent of one-third in the expense of litigating the patent. The respondents refused to accede to his request to permit the use of his patent in connection with an ammonia extracting process he had, and the relations between them grew strained. These differences finally culminated in demands by the complainant for an accounting for one-third of the profits of the respondent's construction business, and for an inspection of the books covering those operations. On the part of the respondents there was a denial of any right of the complainant to share in such profits, and a refusal to allow him access to any books save the stubbook from which licenses were issued. On the hearing it developed that certain contested royalties had been collected, which were not accounted for in full to complainant, nor was he informed of the whole amount collected. While we are not, in our view of the case, required to pass upon the question whether respondents had a right to deduct the portions of such royalties retained by them, and we express no opinion on that point, we are free to say there was such an absence of frankness on their part—if not, indeed, concealment—as to afford ground for much of the feeling displayed in this controversy.

Under the proofs, is the complainant entitled to a decree of cancellation? After mature consideration, we are of opinion he is not. The question has been raised in limine that a court of equity will not lend its aid to enforce a forfeiture; citing Horsburg v. Baker, 1 Pet. 232, 7 L. Ed. 125; Marshal v. Vicksburg, 15 Wall. 146, 21 L. Ed. 121; Jones v. Guaranty & Indemnity Co., 101 U. S. 622, 25 L. Ed. 1030. But waiving for present purposes that question, we are of opinion such a decree should not be awarded, because to do so would be inequitable, under the proofs. The agreement vested in A. B. Duff, as trustee, and later in Gilliland, his successor, the legal title to this patent. The general scope of the agreement contemplated payment of a proportionate royalty to the complainant. The license granted contemplated the erection of a structure of a special kind. There was no express restriction in the paper preventing the

Duff Patents Company from building producers. So long as they did not take advantage of the agreement and their relation to the patent to restrict licensing or to reduce the royalty, we see nothing in the contract or in the relation of the parties to preclude them from erecting such producers. And such being the case, there is no covenant, express or implied, in the agreement, which gave the complainant an interest in the profits or a liability for the losses made by the Duff Patents Company in such construction work. Indeed, the agreement is silent on that point, and it would seem that when it was made the parties only contemplated a grant of licenses, and had not considered engaging in erection work. But the fact remains that as the business progressed the Duff Patents Company did go into construction work, and the complainant took no steps to prevent them from doing so. On the contrary, as we have seen, he encouraged them to proceed; and, while he did nothing to induce Gilliland to purchase an interest in the company, he not only gave no intimation or notice at that time of his purpose to allege such work as in violation of the contract, but signified his purpose to allow it to be continued. Under these circumstances, we think it would be highly inequitable for him later to allege such a course of conduct as a ground of forfeiture and cancellation. It is contended, however, that Gilliland, the new trustee, did not follow A. B. Duff's course, and that he refused to grant licenses, unless in cases when the Duff Patents Company got the contracts for building. Granting for present purposes such to be the case, this did not show the building operations of the Duff Patents Company, when they did build and paid a proper license fee, were in violation of the contract, but, rather, that it was exercising that right in other respects in an improper and inequitable way, and one for which complainant could hold it responsible in damages. The building operations of the company not being illegal under the contract, we are of opinion the complainant had no right to participate in the profits therefrom, and consequently he had no right to an inspection of the books covering such erection work. The denial of his right to such profits, and respondent's refusal to allow an inspection of books covering their erection operations, therefore afford no ground for forfeiture and cancellation.

The proofs therefore failing to sustain these fundamental grounds of relief, we are of opinion the bill should be dismissed. In doing so, however, we feel the action of the respondents in failing to disclose the amounts of royalties they had received in certain cases justifies this court in dividing the costs.